JAN 22 2025 PM3:21
FILED USDC-CT-HARTFORD

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

IN RE: SEIZURE WARRANT

3:25-mc- 13 _____ (TOF)

## AFFIDAVIT IN SUPPORT OF
## SEIZURE WARRANT

I, Melissa I. Gaud, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI"), where I have been employed since September 2018. I have a Bachelor of Science degree in Medical Laboratory Sciences from Rutgers University in partnership with the University of Medicine and Dentistry of New Jersey, and a Master of Science degree in Forensic Science from John Jay College of Criminal Justice.

2.    Before becoming a Special Agent, I was a medical laboratory scientist in a hospital setting for approximately eight years with extensive experience in viewing and interpreting medical records. I am currently certified as a Medical Laboratory Scientist by the American Society of Clinical Pathologists (ASCP).

3.    Since February 2019, I have worked in the FBI New Haven Division's complex financial crimes squad. In my capacity as a Special Agent, I have handled investigations involving health care fraud, corporate securities and commodities fraud, and crimes involving computer activity. I have participated in the execution of warrants involving the search and seizure of computers, computer equipment, software, and electronically stored information.

4.    I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code, in that I am empowered by

law to conduct investigations and to make arrests for federal felony offenses.

5.    I make this affidavit in support of an application for seizure warrant for the contents of Liberty Bank ending in 9612, held in the name of Minds Cornerstone LLC with signatory of Suhail Aponte ("**Target Account**") for violations of violations of Title 18, United States Code, Section 1349 (conspiracy to commit health care fraud) and Title 18, United States Code, Section 1347 (health care fraud).[1]

6.    **Individual 1** currently resides in Middletown. As discussed further below, from approximately April 17, 2024 to November 19, 2024, **Individual 1** served a sentence of imprisonment arising from a previous health care fraud. Upon **Individual 1**'s release, he reports to a state parole officer.

7.    **Individual 2** currently resides in Wethersfield. As discussed further below, **Individual 2** works as a state employee.

8.    The facts in this affidavit come from my personal observations, my review of the documents and records discussed herein, my training and experience, and information obtained from other agents, law enforcement officers and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrants and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>PROBABLE CAUSE</u>

9.    Along with the U.S. Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"), the Medicaid Fraud Control Unit ("MFCU") of the Connecticut

---

[1] Hereinafter, **Individual 1** and **Individuals 2** are identified as follows:  Ramon Apellaniz, also known as Kristopher Rockefeller, also known as Kris,  ("**Individual 1**") (year of birth: 1985), and Suhail Aponte ("**Individual 2**") (year of birth: 1986)

Office of the Chief State's Attorney, and the Federal Bureau of Investigation ("FBI"), I have been investigating **Individual 1**, **Individual 2**, and **Minds Cornerstone LLC, dba Minds Cornerstone Behavior Therapy Services ("Company 1")**. The government has been investigating allegations that, beginning no later than November 1, 2021 and continuing to the present, **Individual 1**, **Individual 2**, and **Company 1** have been defrauding the Connecticut Medicaid Program by submitting fraudulent claims for applied behavior analysis ("ABA") services to children diagnosed with Autism Spectrum Disorder ("ASD"). Although **Individual 1** does not appear on any of **Company 1**'s Medicaid enrollment forms, has no ownership interest in **Company 1**, and has no signatory authority to any of the bank accounts in **Company 1**'s name, the ongoing investigation has revealed that **Individual 1** has been running **Company 1** under a pseudonym and conspiring with **Individual 2** to defraud Medicaid, even when **Individual 1** was serving a state sentence for Medicaid fraud arising from his operation of **Company 2**.

10. More specifically, and as discussed further below, **Individual 1** and **Individual 2** have conspired to bill, and did bill, Medicaid for: (1) services purportedly rendered to patients when **Company 1's** payroll records indicate **Company 1's** employees were not compensated for the associated services; (2) direct supervision services purportedly provided by a Board Certified Behavior Analyst ("BCBA") of a behavioral technician, when the corresponding procedure code for behavioral technician services was not billed; (3) services purportedly rendered to patients who were actually in an inpatient hospital; and (4) services purportedly rendered when parents of patients and former employees of **Company 1** confirmed those services did not occur. As discussed further below, **Company 1** uses an electronic health records (EHR) platform to maintain records of patient appointments, employee scheduling, and services rendered. In the

3

course of this investigation, the government sought and obtained a warrant to search **Company**

**1**'s EHR account in Case No. 3:24MJ922 (MEG).

> A.    **The Medicaid Program in Connecticut**

11.    The Connecticut Department of Social Services ("DSS") provides medical

assistance to low-income persons and people who could otherwise support themselves if not for

the fact that they have excessive health care costs. DSS provides this assistance through the

Connecticut Medical Assistance Program (CTMAP). CTMAP offers a comprehensive health

care benefit package that includes the following:

> a.    HUSKY A - Family Medicaid;
> b.    HUSKY B - State Children's Health Insurance Program ("SCHIP");
> c.    HUSKY C - previously referred to as Medicaid, Title XIX, fee-for-service, or Adult Medicaid; and
> d.    HUSKY D - previously referred to as Medicaid for Low Income Adults ("MLIA").

12.    The HUSKY programs identified above are joint federal-state government

programs designed primarily to finance the provision of the medical services to the indigent.

This affidavit refers to the various HUSKY programs above collectively as "Medicaid." DSS

administers these Medicaid programs in Connecticut. The Medicaid program is administered at

the federal level by the Centers for Medicare and Medicaid Services and is funded approximately

50 percent by the federal government. The remaining approximately 50 percent is funded by the

State of Connecticut.

13.    Medicaid is a public plan or contract that pays claims submitted by participating

health care providers for medically necessary benefits, items, and services rendered to Medicaid

members. As such, Medicaid is a "health care benefit program" under 18 U.S.C. § 24(b).

14.    In order to participate in the Medicaid program, health care providers complete

enrollment forms and must provide proof of licensure. As part of their enrollment, providers

certify that they will abide by all applicable federal and state statutes and regulations and will

keep accurate and current records regarding the nature, scope, and extent of services furnished to

Medicaid recipients. They also acknowledge prohibitions against the following:

    a.    false statements, misrepresentation, concealment, failure to disclose, and conversion of benefits;
    b.    any giving or seeking of kickbacks, rebates, or similar remuneration;
    c.    charging or receiving reimbursement in excess of that provided by the State; and
    d.    false statements or misrepresentation in order to qualify as a provider.

15.    When Medicaid sends payments to providers for services, Medicaid also sends a

document called a remittance advice/notice to the provider. The remittance advice/notice details

the amount Medicaid paid or denied for each claim. Unlike many other health benefit plans,

Medicaid does not send Explanation of Benefits forms to its recipients for claims submitted to

Medicaid. As a result, Medicaid recipients generally do not know if a provider has billed

Medicaid for services that the member did not in fact receive.

### A.    Board Certified Behavior Analysts (BCBAs) and Behavioral Technicians (BTs)

16.    According to the Behavior Analyst Certification Board (BACB), a nonprofit

corporation that certifies practitioners of applied behavior analysis, ABA is based on the use of

learning principles to improve lives. The practice of ABA focuses on assessing the

environmental influences on behavior, assessment-based intervention, and data-based decision

making. Among other populations, ABA has been used to address the behavioral needs of

individuals diagnosed with autism. In young children with developmental disabilities such as

ASD, the goal of intensive, comprehensive intervention is to improve cognitive, language, social,

and self-help skills.

17.    The BACB also explains that "the Board Certified Behavior Analyst (BCBA)

certification is a graduate-level certification in behavior analysis. BCBAs are independent

5

practitioners who provide behavior-analytic services and supervise the work of RBTs, BCaBAs, and other professionals who implement behavior-analytic interventions." Unlike BCBAs, behavioral technicians (BTs) are not individually enrolled providers under Medicaid and their names do not appear on Medicaid claims data. Instead, their services are billed under the supervising BCBA.

18.     Beginning on July 1, 2016, DSS instituted several policies for ASD services relevant to this investigation. Among other policy advisements, DSS required that "[a] qualified BCBA or licensed practitioner can be reimbursed in addition to the ASD treatment services provided by the technician or BCaBA when the BCBA or licensed practitioner directly observes or directs these services."

      **B.**     **Individual 1, Individual 2, and Company 1**

19.     **Individual 2** is a resident of Wethersfield. Since approximately May 2022, **Individual 2** has been employed in the state's Office of Policy and Management. According to the State of Connecticut's public license database, **Individual 2** is not a licensed provider. The investigation has revealed, however, that **Individual 2** allegedly provided services as a behavioral technician at **Company 1**. **Individual 2** also assisted BCBAs in performing assessments, which she was not qualified to perform.

20.     **Company 1** is an Autism Specialist Group that was registered in the State of Connecticut on or about June 23, 2021. **Individual 2** was listed as the manager and registered agent. As of **Company 1**'s most recent annual report filed in March 2024, **Individual 2** remains the sole principal and agent of Company 1.

21.     After initially enrolling under a different entity's name in November 2019, **Company 1** reenrolled with the Connecticut Medicaid Program on or about November 30, 2021.

6

While **Company 1**'s November 30, 2021 Medicaid enrollment form listed **Individual 2** as its sole contact person, Waverly Debraux ("Individual 3") is listed as having a 100% controlling interest in **Company 1**. On or about February 21, 2023, in connection with an audit interview DSS conducted with **Individual 2**, DSS asked **Individual 2** what role Individual 3 had in running **Company 1**. **Individual 2** claimed to not know who Individual 3 was and that she was the sole owner of **Company 1**.

22.    Approximately one week later, via a fax dated February 28, 2023 under **Company 1**'s letterhead, **Individual 2** informed the contracted fiscal agent of DSS that **Individual 2** had "inadvertently entered the incorrect information under [**Company 1**'s enrollment application for] controlling interest." **Individual 2** then listed herself as the "owner" of **Company 1** with a 100% controlling interest. When DSS's fiscal agent asked **Individual 2** proof of ownership interest, **Individual 2** submitted an executed purchase of business agreement dated June 1, 2021 that purported to show **Individual 2** purchasing the interest in **Company 1** from Individual 3 for $1.00. In a re-enrollment for **Company 1** filed on or about April 26, 2023, **Individual 2** is listed as the sole owner.

23.    In **Company 1**'s most recent enrollment application in April 2023, **Individual 2** indicated that **Company 1** stored its health records electronically.

24.    **Individual 1**, formerly of East Hartford and currently of Middletown, Connecticut, previously operated a company called The Gemini Project, LLC ("Company 2"), a Newington business that offered counseling to numerous patients with mental, behavioral, and emotional disorders. According to the State of Connecticut's public license database, **Individual 1** is not a licensed provider.

25.    On or about January 15, 2020, **Individual 1** was arrested and charged by the

7

Connecticut Office of the Chief State's Attorney, Medicaid Fraud Control Unit ("MFCU"), with one count of Larceny in the First Degree by Defrauding a Public Community, one count of Health Insurance Fraud, and one count of Identity Theft in the First Degree.

26.     According to the arrest warrant affidavit prepared by the MFCU Police Inspector, **Individual 1** was not licensed to provide counseling services but was the sole owner of Company 2, which employed only one professional that was licensed to provide these services. However, MFCU's investigation revealed that **Individual 1** provided services to multiple Medicaid beneficiaries as a non-licensed provider and Company 2 was billing Medicaid for **Individual 1**'s services. Company 2 also billed Medicaid for services not rendered at all. According to MFCU, **Individual 1** admitted in an interview on July 16, 2019 that he could not bill for a client who was in the hospital who was not receiving any services. When asked how often records were "fudged for clients," **Individual 1** responded: "not very often." At the conclusion of the interview, **Individual 1** stated that he "never committed a criminal act in [his] life," that he "went to school and everything." He also reportedly stated that he was "sorry for everything" and that the billing for Company 2 was wrong.

27.     MFCU determined that from January 2018 to July 2019, Company 2 submitted claims to Medicaid for 9,617 claims for services provided by unlicensed individuals or not at all. Medicaid paid Company 2 $909,268 for these claims. 462 claims were submitted for services that were not rendered at all.

28.     On or about September 12, 2023, **Individual 1** pleaded nolo contendere to these state charges. On or about April 17, 2024, **Individual 1** was sentenced in Hartford Superior Court. Individual 1 told the state court judge that he "wanted to apologize to the Department of Social Services for what [he did]" and vowed to "do everything [he could] to amend that." The

state court sentenced **Individual 1** to eight years in prison, execution suspended after 15 months served, with five years of parole. As of that date, **Individual 1** paid $156,000.00 in restitution, with the remaining $753,269.00 to be paid during probation.

29.    On or about April 17, 2024, **Individual 1** entered the custody of the Connecticut Department of Corrections. On or about May 1, 2024, **Individual 1** was transferred to the Osborn Correctional Institution. He was released from DOC's custody on November 19, 2024. As discussed further below, while in DOC custody, **Individual 1** communicated with **Individual 2** about the operations of **Company 1** and the **Target Offenses**.

30.    **Individual 1** is not listed on any of **Company 1**'s corporate registration forms in Connecticut or in **Company 1**'s Medicaid enrollment forms.

31.    On November 30, 2021 and again on April 26, 2023, **Individual 2** certified that, as an enrolled Medicaid provider, **Company 1** would "abide by all applicable federal and state statutes, regulations, policy transmittals, and provider bulletins; *to keep accurate and current records regarding the nature, scope and extent of services furnished to Medical Assistance recipients*" (emphasis added). In addition, as an enrolled Medicaid provider, **Company 1** agreed to "maintain a specific record for each client eligible for the Connecticut Medical Assistance Program benefits, including but not limited to name; address; birth date; Social Security Number; DSS identification number; pertinent diagnostic information including x-rays; current treatment plan; treatment notes; documentation of dates and services and services provided; and all other information required by state and federal law."

32.    On November 30, 2021 and again on April 26, 2023, **Individual 2** indicated that there were no board members, partners, or managing administrators in the organization. **Individual 2** denied that **Company 1** had "any owners, partners, members, officers, directors,

shareholders, or managing employees of [the] applicant related by family, marriage, ownership, membership, control, or business relationship to any other provider that is currently, or within the last 5 years, has been enrolled in the Connecticut Medical Assistance program." **Individual 2** further denied that that "any owner, partner, member, officer, director, shareholder, or managing employee of [**Company 1**] owe money to the federal government and/or any State for Medicare and/or Medicaid involvement in the past." Furthermore, **Individual 2** denied that there had "been any disciplinary, administrative, civil, or criminal actions taken against applicant, a family member, partner, member, director, officer, or managing employee in any way related to the provision of health care goods or services, including but not limited to those goods or services covered by Medicare or Medicaid."

33.     Finally, **Individual 2** also acknowledged in **Company 1's** enrollment application that they understood the prohibitions in state and federal law of "false statements, claims, misrepresentation, concealment, failure to disclose and conversion of benefits," "charging or receiving reimbursement in excess of that provided by the State," and "false statements or misrepresentation in order to qualify as a provider."

     **C.**     **Individual 2's Audit Interview with DSS**

34.     On or about February 21, 2023, **Individual 2** met with representatives from DSS in connection with a DSS audit for the period of November 1, 2021 to October 31, 2022. Although such audit interviews usually took place at the provider's offices, **Individual 2** requested that the meeting occur at DSS's offices because she was running the business completely electronically on her laptop and preferred to bring her laptop to DSS rather than to have DSS visit her home.

35.     During the interview, **Individual 2** explained that appointments with Medicaid

clients are electronically scheduled through the calendar feature of **Company 1**'s electronic health records (EHR) platform. **Individual 2** further confirmed that clients are seen in person and not online. **Individual 2** denied using telehealth to provide ABA services.

36.     With regard to tracking timed services, **Individual 2** stated that every BT has an app on their phone where they log in when they arrive at the client's home and then sign out when done. The child's parents sign off as well at the end of visit. **Individual 2** said she used this logged time to determine the duration of service.

37.     **Individual 2** also represented to DSS that BCBAs conduct supervision at the client's home at least once a week. The analyst's note in the EHR platform includes the name of the BT they supervised.

38.     **Individual 2** acknowledged that she was responsible for entering and billing Medicaid. When asked what she did to ensure that the proper procedure code was included on a claim, **Individual 2** said that each claim or visit is entered as a separate claim. Before the claim is made, **Individual 2** double checked **Company 1**'s records for signatures and confirmed that the notes are completed and ready to bill.

**D.     How Providers Bill Medicaid: CPT and HCPCS Codes**

39.     In order to bill health care benefit programs such as Medicaid, Medicare, or private health insurance programs, providers use a five-digit number, known as a Current Procedural Terminology ("CPT") code, which identifies the nature and complexity of the service provided. The CPT codes are listed in a manual that is published annually by the American Medical Association. CPT codes are universally used by health care providers to bill government and private health insurance programs for services rendered. Virtually every medical procedure has its own CPT code and Medicaid and private insurance companies pay a specified amount of

money for each CPT code billed. Within the CPT manual, there is also another set of health care procedure codes, known as Healthcare Common Procedure Coding System, or HCPCS, that identify products, supplies and services not otherwise identified in the CPT manual.

40.    Typically, providers submit CPT or HCPCS codes using a claim form, known as a CMS 1500. The CMS 1500 form, completed by the provider or their billing contractor, includes, among other information, the name and provider number of the provider who rendered the service; the name of the patient who received the service; the date the service was performed; a code delineating where the service was provided; the procedure that was rendered (identified by CPT code); and the diagnosis of the patient's condition for which the service was rendered. Most providers, including **Company 1** and **Individual 2**, submit or cause claims to be submitted to Medicaid electronically.

41.    When a provider submits a claim, the provider certifies that the services identified on the form were "medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision."

42.    For the time period of December 8, 2021 to June 6, 2024, **Individual 1** and **Individual 2** submitted or caused to be submitted claims to Medicaid under CPT code 97153 or HCPCS code H0046 approximately 98 percent of the claims submitted. According to the CPT manual, CPT code 97153 is defined as follows: "Adaptive behavior treatment by protocol, administered by technician under direction of a physician or other qualified health care professional, face-to-face to one patient, each 15 minutes." HCPCS code H0046 is defined as follows: "Mental health services, not otherwise specified."

43.    HCPCS code H0046 is the code BCBAs bill when they directly supervise and observe the work of BTs. Effective July 1, 2016, DSS stated that "[i]n order to bill for this

12

service [H0046], the BCBA or licensed practitioner must be in person, in the same room, and directly observing the technician or BCaBA providing intervention services to a member. The goal of service is to allow experienced practitioners to provide instantaneous or 'in the moment' direction to the technician or BCaBA who is delivering the ASD treatment services. Direct Observation and Direction must be billed using procedure code H0046. Please note that this code is billed in 15 minute increments and can be billed at the same time as ASD Treatment Services." As of March 23, 2020, and a result of the pandemic, DSS permitted BCBAs to perform their services via telemedicine if the technician was delivering the treatment in the home of the provider or if the patient, technician, and BCBA were all using the same telemedicine platform to deliver service and the BCBA could observe the technician providing the ASD services. Moreover, "[d]ocumentation for this service must include the name and credentials of the licensed practitioner or BCBA, the date, the location, the duration of the direct observation and direction, and the name of the technician or BCaBA receiving the direct observation and direction."

## COMPANY 1's CLAIMS TO MEDICAID

44.     Investigators have reviewed the claims **Company 1** submitted or caused to be submitted to Medicaid for dates of service from November 16, 2021 through at least September 17, 2024 that were paid. During that time period, there were approximately 21,444 claims totaling over $3.9 million paid to **Company 1**. Based on the ongoing investigation, probable cause exists that **Individual 1**, **Individual 2**, and **Company 1** have committed the **Target Offenses**.

A.      **Company 1 Repeatedly Billed Medicaid for Services Purportedly Rendered to Patients When Company 1's Payroll Records Indicate Company 1's Employees were not Paid for the Associated Services.**

13

45.    As part of the investigation, investigators obtained payroll records for **Company 1** from its third-party online payroll management vendor and compared them to Medicaid billing data for **Company 1**. **Company 1** regularly billed Medicaid for more ASD timed services, including claims billed under CPT code 97153 and HCPCS code H0046, than the number of hours **Company 1** paid these employees. In the absence of any indication thus far that **Company 1**'s employees worked for free, this discrepancy is consistent with **Company 1** billing Medicaid fraudulently.

46.    Between March 20, 2022 and February 17, 2024, **Company 1** paid BCBAs and behavioral technicians on a bi-weekly basis. For the pay period of March 20, 2022 to April 2, 2022, payroll records show that **Company 1** paid its BCBAs, collectively, for 56 hours of work. However, according to **Company 1**'s Medicaid claims for time-based codes, **Company 1** billed Medicaid, and was paid for, 89.5 total hours of purported BCBA services during this same period, or a 37.43% inflation of hours. Medicaid paid **Company 1** $6,798.10 for BCBA services during this period, resulting in $2,544.54 in overpayment.

47.    Similarly, during the same pay period, **Company 1** billed and was paid by Medicaid a total of 287.75 hours for timed services provided by behavioral technicians under CPT Code 97153. However, according to payroll records, behavioral technicians were paid for a cumulative 113.75 hours of work, resulting in a 60.47% inflation of hours. Medicaid paid **Company 1** $12,948.75 for these services, resulting in an $7,830.00 overpayment.

48.    Of the 50 bi-weekly pay periods reviewed to date between March 20, 2022 and February 17, 2024, there were 28 pay periods where the number of BCBA hours billed to and paid by Medicaid exceeded the number of BCBA hours recorded in **Company 1**'s payroll records, with an average of 11.63% inflation in hours. There were 49 pay periods where the

14

number of behavioral technician hours billed to and paid by Medicaid exceeded the number of

behavioral technician hours recorded in **Company 1**'s payroll records, with an average of

58.28% inflation in hours. Based on this analysis, Medicaid paid approximately $51,881.51 for

BCBA services for which there are no corresponding payroll hours and $1,103,595.65 for

behavioral technician services for which there are no corresponding payroll hours, with a total

potential overpayment of $1,155,477.16.

      **B.**      **Company 1 Repeatedly Billed Medicaid for Direct Supervision of a Behavioral Technician by a BCBA When Behavioral Technician Services Were Not Billed.**

49.      Consistent with the discrepancies between **Company 1**'s payroll and its Medicaid

claims described above, the investigation has also revealed that **Company 1** consistently billed

HCPCS code H0046 when there was no corresponding CPT code 97153, as DSS would and did

expect.

50.      DSS itself reviewed **Company 1**'s claims for HCPCS code H0046 for dates of

service from November 16, 2021 through November 8, 2023. DSS found that a total of

$733,783.06 was paid to **Company 1** for HCPCS code H0046 claims. Of this $733,783.06,

$234,970.04—or approximately 32 percent—was paid for HCPCS code H0046 claims where

there were no corresponding behavioral technician services (CPT code 97153) claimed on the

same date of service for that patient. Since HCPCS code H0046 should indicate that the clinician

is directly observing and providing oversight to the technician, it should be claimed when CPT

code 97153 is also occurring.

51.      As part of this criminal investigation, federal investigators have corroborated

DSS's findings. Based on the Medicaid claims, for the time period of March 9, 2021 through

February 7, 2024, investigators had identified that **Company 1** submitted 1,701 claims under

HCPCS code H0046 across 81 patients where there was no corresponding CPT code 97153 claim. DSS paid **Company 1** a total of $288,031 for such claims.

52.     Separately, DSS performed an analysis of HCPCS code H0046 claims with no corresponding CPT code 97153 claims submitted by *all* the Connecticut Medicaid billing providers for dates of service between November 16, 2021 through November 8, 2023. There were a total of eighty-two such billing providers. **Company 1** appeared to be the top outlier billing provider. It had 1,370 instances where it submitted HCPCS code H0046 claims with no 97153 claims on the same client on the same date of service. The next outlier provider in the state had 284 such instances in the same time period.

### C.     Company 1 Repeatedly Billed Medicaid for Purportedly Providing ABA Services to Hospitalized Patients.

53.     As part of the investigation, investigators reviewed Medicaid claims data to determine whether **Company 1** billed Medicaid for purportedly providing ABA services to any Medicaid member while the member was admitted as an inpatient at a hospital. For purported dates of service from July 3, 2022 through February 2, 2024, Medicaid claims data revealed that **Company 1** has been paid $12,801 for purportedly providing 74 ABA-related services to 7 patients who were admitted as inpatients at a hospital on the date of service.

54.     For instance, a juvenile patient with initials C.P. was admitted to a hospital on September 25, 2023, and discharged on October 4, 2023. During this time, when presumably no ABA services were provided to the patient, **Company 1** nevertheless billed Medicaid for a BCBA purportedly rendering two hours of services to C.P. on each of September 26, 2023, September 27, 2023, and October 3, 2023, for six hours total. Moreover, these claims were billed under HCPCS code H0046, but there were no corresponding claims for a BT's services. Additionally, **Company 1** represented on the claim that the services were provided at the home

16

of C.P.

### D.    Interviews Confirm Company 1 Repeatedly Billed Medicaid for Services Not Rendered.

55.     Investigators have conducted interviews of both parents of **Company 1**'s clients and former employees regarding **Company 1** and services billed to Medicaid, who further corroborate **Individual 1**, **Individual 2**, and **Company 1**'s violations of the **Target Offenses**.

#### a.    Parent 1

56.     As part of the investigation, agents interviewed Parent 1, the mother of a minor with the initials A.S. ("Patient 1"), who received services from Company 1. Parent 1's child was diagnosed with autism spectrum disorder and Down Syndrome. Patient 1 was referred to **Company 1** for ABA therapy and assessment.

57.     In January and February 2023, Parent 1 texted with "Kris" from **Company 1** about onboarding Patient 1. Parent 1 advised that she does not know Kris's last name as he never signed any emails with it. After completing the initial paperwork for Patient 1, Parent 1 asked Kris if she could drop it off at **Company 1**'s office because it contained personal identifying information and Parent 1 did not feel comfortable emailing it. Kris advised her that she could not and that was the first red flag Parent 1 saw with **Company 1**.

58.     The initial consultation and observation were conducted on February 15, 2023, by a BCBA via video telehealth. Patient 1's care team consisted of a BCBA and three BTs at various times. In particularly, Parent 1 thought well of a particular BT, Former Employee 1 discussed further below, who provided services to Patient 1. Parent 1 was disappointed when Former Employee 1 left **Company 1**. Parent 1 recalled signing off on session notes in a BT's phone.

59.     Parent 1 relayed that the BCBA was only physically present in the home four or

five times for about one hour each time and only when a BT was also present. Other than that,
Parent 1 believed the BCBA conducted supervision with the BT on the phone via video chat.
Former Employee 1 expressed her frustration to Parent 1 that the BCBA rarely told Former
Employee 1 if the supervision was to occur via video. According to Parent 1, Former Employee
1 felt alone and this is what ultimately led to her leaving **Company 1** on or about October 10,
2023.

60.    After Former Employee 1's departure, Patient 1 did not receive services from
**Company 1** between October 10, 2023 to November 1, 2023. In fact, on October 26, 2023, Kris
(i.e., **Individual 1**) texted Parent 1: "I didn't forget about you[.] I'm waiting to get the schedule
of the BCBA that I think can do[.]" The services resumed thereafter with a new BT. Medicaid
records indicate, however, that **Company 1** billed Medicaid for 22 claims concerning Patient 1
for dates of service from October 10, 2023 to November 1, 2023. **Company 1** was paid a total of
$3,961.96 for these services not rendered.

61.    Investigators showed Parent 1 the claims billed by **Company 1** for BCBA
supervision services purportedly provided on most Mondays and Wednesdays. Parent 1 stated
the BCBA was not providing those services. The BCBA worked full time at a school and Parent
1 knew that the BCBA was supposed to be providing 16 hours of supervision. According to
Parent 1, Patient 1 did not receive anywhere close to that amount.

62.    In November 2023, Parent 1 contacted **Company 1** to request a statement or
accounting of services purportedly provided to Patient 1. A "Chris" (who investigators believe to
be "Kris" or **Individual 1**) from **Company 1** responded and requested "some time to gather the
documentation you requested." In early December 2023, a person using **Company 1**'s Gmail
account emailed Patient 1 a spreadsheet of hours worked and billed for dates of service from

February 27, 2023 through May 31, 2023. After reviewing this spreadsheet, Parent 1 became worried that **Company 1** was billing for services not rendered and felt that she might be held liable in the future for the claims that Medicaid paid for. She also never received documentation of additional dates past May 31, 2023. Because of this, Parent 1 became more confrontational with **Company 1** representatives and started asking more questions. **Individual 2** wanted to have a meeting at Parent 1's home, but Parent 1 did not want people she had never met in her home. Parent 1 responded by saying that if the meeting was to happen at her home, she would make sure that DSS and other representatives were present. This meeting never occurred. On December 22, 2023, Parent 1 received an email from **Individual 2** notifying her that Patient 1 had been discharged from **Company 1**'s care.

63.     Parent 1 believed that **Individual 2** was **Company 1**'s receptionist and **Individual 1** was "the main guy" who was a "smooth talker" and "smooth[ed] things over." Parent 1 communicated with **Individual 1** much more often than **Individual 2**.

### b. *Former Employee 1*

64.     Investigators have also interviewed Former Employee 1, who worked at **Company 1** from approximately September 2022 through September 2023 as a behavioral technician and who was the primary BT who provided services to Patient 1 described above.

65.     Former Employee 1 submitted her resume to **Company 1** and received an email from **Company 1**'s Gmail account, which instructed Former Employee 1 to complete an employment application and other paperwork. The email was signed "[**Individual 1**'s first name alias], M.Ed., MPA" as "HR Director." Former Employee 1 explained that she did not know **Individual 1**'s last name, has never met him in person, and does not know what he looks like. Former Employee 1 only spoke with **Individual 1** over the telephone.

66.    Former Employee 1 was aware of another owner/supervisor of **Company 1**, **Individual 2**. Former Employee 1 has never spoken with **Individual 2** and only saw her in person once at a company Christmas party. Former Employee 1 does not have **Individual 2**'s phone number.

67.    Former Employee 1 felt that she was not properly supported or supervised by the BCBAs. As one example, Former Employee 1 provided services to one minor patient with the initials J.R. ("Patient 2") from approximately December 2022 through June 2023. Former Employee 1 usually worked with Patient 2 for four hours Monday through Friday. During that time, however, Former Employee 1 recalled that the BCBA assigned to the case ("BCBA 1") only had two video sessions with her for approximately 30 minutes each. Former Employee 1 never met BCBA 1 in person. Along with her pay, the lack of supervision was one of the reasons why Former Employee 1 left **Company 1**.

68.    A review of **Company 1**'s Medicaid claims for Patient 2 shows that, between December 1, 2022 through June 30, 2023, **Company 1** submitted and was paid for 57 claims under HCPCS code H0046, each for two hours of supervision purportedly provided by BCBA 1, for a total of 114 hours. Medicaid paid **Company 1** $9,667.20 for these purported services.

69.    Former Employee 1 explained that **Company 1** used an EHR platform for employees to clock in, clock out, and draft treatment notes. When an employee clocked in and out, the EHR platform logged the GPS coordinates for that employee. Former Employee 1 knew this because **Individual 1** told Former Employee 1 that she was not supposed to clock in until she had reached the client's house. For example, Former Employee 1 once clocked in from the street of a client's house and **Individual 1** called her to instruct her that she needed to clock in at client's house itself. At the end of each shift, Former Employee 1 wrote a treatment note and the

client's parent signed the note within the EHR platform app electronically.

70.     Former Employee 1 said that her pay was tied directly to the hours logged in the EHR platform. She was only paid for the house that she worked.

71.     Former Employee 1 set up her work schedule in the EHR platform and was told by **Individual 1** to anticipate which days and hours she might work. If Former Employee 1 needed to cancel a client visit, she cancelled the service in the EHR platform and replaced it on another day. Former Employee 1 recalled telling **Individual 1** that she could not work for a period of time and **Individual 1** told her that she did not need to notify him and to just notify the client's family. From then on, Former Employee 1 told the supervising BCBA and the client's family if she needed to cancel.

72.     Investigators asked Former Employee 1 about Patient 1. Former Employee 1 worked with Patient 1 from approximately March 20, 2023 through October 2023. The supervising BCBA for Patient 1 ("BCBA 2") met with Former Employee 1 approximately five or six times in person and five or six times by Zoom. When asked whether BCBA 2 provided approximately 55 dates of service for Patient 1, as reflected in the Medicaid claims data, Former Employee 1 stated: "definitely not … not even once a week."

73.     Former Employee 1 said that she knew that BCBA 2 worked at a school as her primary job. Former Employee 1 said BCBA 2 had about eight to ten clients that she supervised at Company 1 and wondered how BCBA 2 managed to do all of it.

74.     A preliminary review of Company 1's Medicaid claims for BCBA 2's services under HCPCS code H0046 revealed that, from May 2021 through June 2024, BCBA 2 allegedly provided 2 to 8 hours of supervision most weekdays, including on national holidays.

   *c.   Former Employee 2*

75.     As part of the investigation, investigators interviewed to another former employee of **Company 1**. This person was a BCBA whose National Provider Identification (NPI) was used by **Company 1** to bill Medicaid for claims ("Former Employee 2"). Former Employee 2 submitted a complaint to DSS shortly after **Company 1** fired her in March 2024; investigators contacted Former Employee 2 in response.

76.     Former Employee 2 resides full-time in Florida. In or around November 2023, Former Employee 2 was interviewed remotely and hired by who she believed to be **Company 1's** Human Resource Manager, "Kris Rockefeller," i.e., **Individual 1**. Former Employee 2 identified a known picture of **Individual 1** as the person she knew to be Kris Rockefeller. She worked at **Company 1** for only a few months.

77.     **Company 1** hired Former Employee 2 as a program manager. Her responsibilities were to oversee other BCBAs, review the plans of care that these other BCBAs prepared, and provide quality assurance. Former Employee 2 also had some of her own patients, for whom she prepared plans of care and supervised BTs. She was allocated 20 clinical hours a week with her assigned patients and 10 administrative hours a week that were not billable to patients.

78.     When Former Employee 2 began working at **Company 1**, she was not enrolled as a Medicaid provider in Connecticut. **Individual 1** helped her with that paperwork. Former Employee 2 knew that **Individual 1** put down **Company 1**'s address in Connecticut in her Medicaid enrollment application. Former Employee 2 has never been to that address.

79.     Former Employee 2 communicated with **Individual 1** mainly by phone; he did not like texts or emails. According to Former Employee 2, **Individual 1** did not like to be on camera and the only times she saw him were when he inadvertently turned the camera on and turned it in his own direction. Former Employee 2 was surprised when **Individual 1** was not at

22

**Company 1**'s holiday party in 2023. **Individual 1** told Former Employee 2 that he never showed **Company 1**'s employees what he looked like in case he needed to fire them.

80.     Former Employee 2 said that **Individual 2** was the owner and CEO of **Company 1**. She never interviewed with **Individual 2** and was only introduced to her. According to **Individual 1**, **Individual 2** was a BCBA. Former Employee 2, however, could not locate any BCBA credentials for **Individual 2**. Separately, Former Employee 2 doubted that **Individual 2** was in fact a BCBA because some of the things **Individual 2** said did not make sense clinically.

81.     At the time Former Employee 2 began working at **Company 1** in November 2023, there were four other BCBAs, including BCBA 1 and BCBA 2 discussed above. Former Employee 2 advised that she had contact with each of these BCBAs every week to serve as a "second set of eyes" to go through session notes.

82.     Former Employee 2 typically completed an assessment and plan of care for a patient in one day, and not over the course of multiple days. Former Employee 2 advised, however, that **Individual 1** added assessment appointments to the EHR platform and spread assessment hours across multiple days.

83.     As Former Employee 2 continued to look at claims data presented to her, she emphasized she never worked weekends, and therefore, the BCBA claims billed on Saturday and Sunday with Former Employee 2 listed as the rendering provider did not occur.

84.     According to Former Employee 2, clinical notes were kept in the EHR platform. **Individual 1** directed employees to input recurring two-hour block appointments for each patient into the EHR platform. **Individual 1** explained that it would make the employees' lives easier. **Individual 1** reasoned that the hours were being worked anyway and it didn't need to be accurate. Although Former Employee 2 did as she was directed, this practice concerned her

because there was no way to appropriately bill for services on the accurate dates they were provided. Former Employee 2 stressed that "none of the times or dates are accurate" for BCBAs within the EHR platform. Former Employee 2 took the notes from the date the assessment was actually completed and re-used them on the dates that **Individual 1** spread out.

85.     Former Employee 2 observed appointments on Christmas Day and asked **Individual 1** if **Company 1** was billing for those services. **Individual 1** told Former Employee 2 to leave it alone because the services were going to be provided at another time. Former Employee 2 also saw time blocked off for school-aged children during school hours. Former Employee 2 asked **Individual 1** if employees were allowed to enter schools, daycares, hospitals, etc. to provide services and was told no. Former Employee 2 added, "All of our session notes are flat out wrong as directed by [**Individual 1**]."

86.     Former Employee 2 elaborated that the EHR platform had Electronic Visit Verification (EVV) enabled for BTs. The GPS tag would provide historical coordinates for BTs. Former Employee 2 did not look at the EVV but she knew **Individual 1** verified the longitudinal and latitudinal coordinates of BTs when they provided services.

87.     Former Employee 2 was told billing for **Company 1** was completed directly from the EHR platform. **Individual 1** told Former Employee 2 that "[i]f it's not in [the EHR platform], you don't get paid."

88.     **Company 1** fired Former Employee 2 on or around March 16, 2024 allegedly because she was not readily available and was resistant to feedback. Former Employee 2 said that **Company 1** had not paid her for some point in early 2024. Former Employee 2 has filed complaints against **Company 1** with DSS, the Connecticut Department of Labor, and the Connecticut Wage and Workplace Standards Division.

     *c.*     ***Former Employee 3***

89.     Investigators have also interviewed Former Employee 3, a BCBA who worked at **Company 1** from approximately September 2022 to April 2024.

90.     Former Employee 3 resides in Florida. Because of Former Employee 3's family situation, she specifically sought out remote BCBA supervisor positions and found **Company 1** on a job search platform. Former Employee 3 interviewed with **Individual 1**, whom she identified from a photo investigators showed her.

91.     Former Employee 3 identified **Individual 1** as the main point of contact for **Company 1**'s employees. **Individual 1** told Former Employee 3 that his responsibilities included company billing and human resources. Former Employee 3 described **Individual 2** as **Company 1**'s CEO, who met with employees only if "important things happened."

92.     In the beginning of her employment with **Company 1**, Former Employee 3 said she dealt with **Individual 1** only by phone. He never showed his face or virtual calls or meetings and Former Employee 3 did not know **Individual 1**'s last name for a full year.

93.     **Company 1** required Former Employee 3 to obtain a Connecticut BCBA license and enroll in Medicaid in Connecticut. **Individual 1** told her what to put in her enrollment paperwork, including using **Individual 2**'s home address as the service location.

94.     Former Employee 3 advised that she did not clock in or clock out, but was paid strictly for what she worked. She documented her hours in the EHR platform and was paid twice a month.

95.     At some point, **Individual 1** instructed Former Employee 3 to split up session hours over multiple days. **Individual 1** said that she (Former Employee 3) did not need to align sessions to a specific day or time.

96.     Investigators questioned Former Employee 3 about a patient with the initials C.P.

discussed in paragraph 54 above and why there were claims submitted under Former Employee

3's NPI when C.P. was hospitalized. Former Employee 3 acknowledged that she did not provide

services when C.P. was hospitalized, although she called C.P.'s parents "maybe twice." She said

that **Individual 1** instructed her to document that she had provided services and to "make them

up a different week."

### COMPANY 1'S ELECTRONIC HEALTH RECORDS CONFIRM THAT IT OVERBILLED MEDICAID

97.     As mentioned above, in October 2024 investigators obtained a search warrant for

records in **Company 1**'s EHR platform.

98.     An ongoing analysis of the records in **Company 1**'s EHR platform and its

Medicaid claims confirm that **Company 1** repeatedly submitted and was paid for claims for

services allegedly provided by BTs when there was no corresponding record in the EHR.

Moreover, investigators confirmed that **Company 1** billed Medicaid for BCBA supervision

services even though there was no corresponding service by a BT that was allegedly supervised.

A preliminary calculation of the fraud loss based on this ongoing analysis is approximately

$1.876 million. This figure, however, is likely to increase upon further investigation. For

example, the records obtained from the EHR warrant stopped in mid-October 2024, but as

discussed further below, investigators believe that the fraud continued through at least mid-

December 2024 and is ongoing.

### INDIVIDUAL 1 PARTICIPATED IN THE TARGET OFFENSES WHILE INCARCERATED

99.     As mentioned in paragraphs 6 and 28 above, **Individual 1** served a sentence

arising from state charges related to Company 2.

100.    As part of the investigation, investigators obtained some of **Individual 1's**
recorded calls while he has been incarcerated at the Hartford Correctional Center. In summary,
**Individual 1** was directing **Individual 2** how to continue the operations of **Company 1** during
his absence. During review of the calls, investigators also learned that **Individual 2** was in
possession of the phone that was utilized by **Individual 1** to communicate with Parent 1 and
Former Employee 1, as well as **Individual 1**'s computers and multiple account passwords used
by **Individual 1**.

101.    For example, during a call placed on April 19, 2024—shortly after he went into
state custody—**Individual 1** placed a recorded call to someone he referred to as his "mom," who
then placed a three-way call to **Individual 2**. **Individual 1** told **Individual 2** that the payroll was
due that day. **Individual 2** responded, "Yup. I'm doing it now." Investigators confirmed that at
the time of the call, an IP address attributed to **Individual 2** can be seen logging into the payroll
software utilized by **Company 1**.

102.    **Individual 1** advised **Individual 2** about the bills that were due and how to access
information in the financial accounts. **Individual 1** told **Individual 2**, "When you go in there,
you'll see exactly how I move the money around." **Individual 1** later told **Individual 2**, "Just
check my mail and if anything, you gotta talk to Wave cause he has any mail for the business is
going to him. He'll send it to the house." Investigators believe that "Wave" refers to Individual
3, Waverly Debraux, whom **Individual 1** shares the address in Dover, Delaware. As noted in
paragraph 20 above, **Individual 2** told DSS she did not know Individual 3.

103.    On April 27, 2024, **Individual 1** instructed **Individual 2** regarding billing: "If
you keep the flow going. If you keep, if you see the numbers how I do them on the [U/I] pad. I
go up just a little bit. If you do that, keep it like that. It'll be fine. It's frustrating. It's all about

27

data, right? So as long as the person is there you can go up a little bit. You know? Not too much, not too little. If it's 8 you can do 12, you know like that?" "As long as the person was there. 13 you can go to 16. Like that. It's how I keep it." "You see the pattern, keep it going." **Individual 2** acknowledged these instructions and agreed to them. Later on the call, **Individual 1** tells **Individual 2**: "All I do is dependent on you, babe."

104.    On or about April 24, 2024, DSS sent a certified letter to **Individual 1** at Hartford Correctional Center to advise him that, because of his state conviction for which he was serving his sentence, he was "ineligible from participating in [the Connecticut Medicaid Program]." Individual 1 was advised that, under state law, "neither [he] nor your employer are eligible to receive any reimbursement from [the Connecticut Medicaid Program] for any goods provided or services performed directly by you, or for any goods provided or service performed under your supervision. You are hereby notified that you are ineligible for participation in the CMAP, effective September 12, 2023."

105.    **Individual 1**'s recorded calls from DOC confirmed he received and reviewed the exclusion letter described above. In fact, on or about June 10, 2024, **Individual 1** read the letter to **Individual 2** on a recorded line. Despite the letter, **Company 1** continued to bill Medicaid for purported services.

106.    During a DOC recorded call on July 19, 2024, **Individual 1** and **Individual 2** discussed a **Company 1** employee who was not following up with BCBAs to ensure timely submission of patient documentation. **Individual 1** said: "When I get out she gonna be fired so it don't matter. I'll be fine." **Individual 2** responded: "Yeah I don't think you would work well with her." **Individual 1** responded that he was "gonna take over everything again" when he was released from prison.

28

## THE TARGET OFFENSES APPEAR TO BE ONGOING

107.    Investigators have reviewed Medicaid claims data for dates of service through December 18, 2024. During **Individual 1**'s service of his sentence from April 17 through November 19, 2024, and even after his release through December 18, 2024, the volume of Medicaid payments to **Company 1** has remained generally consistent. Indeed, for purported dates of service between April 17 and December 18, 2024, **Company 1** submitted 5,604 claims that were paid by Medicaid, which resulted in total payments of $1,077,850.55, or an average of $134,731.32 per month. Moreover, Medicaid claims data shows that, for dates of service between November 20 through December 18, 2024 alone, **Company 1** submitted 723 claims that were paid a total of $142,706.84. Therefore, investigators believe the **Target Offenses** described in this affidavit is actively ongoing,

## INFORMATION RELATING TO TRACING AND FORFEITURE

108.    As alleged in paragraph 98, a preliminary calculation of the fraud loss based on this ongoing analysis is approximately $1.876 million. This figure, however, is likely to increase upon further investigation.

109.    **Company 1** maintained several bank accounts. One of these accounts was Liberty Bank account ending 5978, held in the name of Minds Cornerstone LLC with a signatory of Suhail Aponte.

110.    Using this preliminary calculation of fraud loss ($1,876,617.00) and comparing it to the total amount paid by Medicaid to account ending 5978 through October of 2024, which was $4,050,146.12, demonstrates that approximately 46.3% of **Company 1**'s billing was fraudulent.

111.    Account ending 5978 is where **Company 1** received all Medicaid payments in

response to the above referenced billing.

112.    Another account held by **Company 1** is the **Target Account**, Liberty Bank ending in 9612, held in the name of Minds Cornerstone LLC with a signatory of Suhail Aponte.

113.    Tracing the Medicaid money deposited into account ending 5978, individual(s) with access to account ending 5978 transferred approximately $764,091.00 from account ending 5978 to the **Target Account**. In 2024 alone, $325,650 was transferred from account ending 5978 into the **Target Account**.

114.    As of December 31, 2024, approximately $269,200.79 remained in the **Target Account**. Moreover, throughout 2024, the **Target Account** maintained positive balance and was never brought to zero.

115.    In addition to the transfers from account ending 5978 to the **Target Account**, individual(s) also transferred money from account ending 5978 to Liberty Bank account ending 8822, held in the name of Platinum R Realty LLC, with a signatory of Suhail Aponte. **Individual 2** used the money in account ending 8822 for personal expenses and some miscellaneous business expenses for a defunct business.

116.    Further, individual(s) transferred money from account ending 5978 to Liberty Bank account ending 3657, held in the name Platinum R Realty LLC, with a signatory of Suhail Aponte. This account was also controlled by **Individual 2**.

117.    A significant amount of cash was also withdrawn from account ending 5978. Between 2021 through 2024, approximately $246,000.00 was withdrawn in cash from account ending 5978.

## **CONCLUSION**

118.    For violations of 18 U.S.C. § 1347, the **Target Account** is subject to civil forfeiture under 18 U.S.C. § 24(a)(1) (defining "federal health care offense" to in include § 1347); 18 U.S.C. § 1956(c)(7)(F) (defining "specified unlawful activity" to include "federal health care offense[s]") and 18 U.S.C. §§ 981(a)(1)(C) (permitting forfeiture for violations of specified unlawful offenses) and 981(b); and subject to criminal forfeiture under 18 U.S.C. § 24(a)(1) (defining "federal health care offense" to in include § 1347) and 18 U.S.C. § 982(a)(7) (permitting forfeiture of gross proceeds of federal health care offenses).

119.    I request that the Court issue seizure warrant for the **Target Account** pursuant to 18 U.S.C. § 981(b), 18 U.S.C. § 982(b)(1), and 21 U.S.C. § 853(f).

Respectfully submitted,

Melissa
Gaud

Digitally signed by
Melissa Gaud
Date: 2025.01.22
11:03:06 -05'00'

MELISSA I. GAUD, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn to before me by Teams this 22 day of January 2025, in Hartford, Connecticut.

Date: 2025.01.22
14:14:42 -05'00'

HONORABLE THOMAS O. FARRISH
UNITED STATES MAGISTRATE JUDGE